IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| J.C.D., Inc. t/a J.L. Terrel's : | |
| and : | Civil Action No. 02-CV-2645 |
| Terrel's Pro Finishes, Inc. : | |
| Plaintiffs : | |
| v. : | Judge Surrick |
| Sherwin-Williams Automotive : | |
| Finishes Corp. : | |
| Defendant : | Jury Trial Demanded |

**Amended Complaint and Demand for Jury Trial**

Plaintiffs, J.C.D., Inc., and Terrel's Pro Finishes, Inc., through counsel, brings these claims for relief against Sherwin-Williams Automotive Finishes, Corp., and assert in support thereof, as follows:

**Preliminary Statement**

1.    Plaintiffs bring this action for damages pursuant to 15 U.S.C. §1 *et seq.,* and pendant state law claims for Defendant's activities in violation of the Sherman Antitrust Act and the Clayton Act, in breach of Defendant's contracts with Plaintiffs, for fraud and for unjust enrichment and misappropriation of trade secrets.  This matter was initially filed in the Court of Common Pleas of Chester County, Pennsylvania, to No. 02-03570, and was removed to this Court, by defendant.

**Jurisdiction and Venue**

2.    This Court has jurisdiction pursuant to 15 U.S.C. §15 and 26, and 28 U.S.C. §1331, and, this Court has authority to hear and determine Plaintiffs' claims under Pennsylvania State Law pursuant to the Court's supplemental jurisdiction under 28 U.S.C. §1367. This Court has venue pursuant to 15 U.S.C. §22, 28 U.S.C. §1391 and as a result of removal, 28 U.S.C. §1441.

**Parties**

3.    Plaintiff, J.C.D., Inc. *t/a* J.L. Terrel's, ("JCD"), is a Pennsylvania corporation located at 111 South Bolmar Street, West Chester, Pennsylvania 19382.  JCD provides automotive finishes

to the original automotive finish and repair automotive finish industries throughout Southeastern Pennsylvania

4.  Plaintiff, Terrel's Pro Finishes, Inc., ("Pro Finishes"), is a Delaware corporation located at 77 McCullough Drive, New Castle, Delaware 19720.  Pro Finishes provides automotive finishes to the original automotive finish and repair automotive finish industries throughout the State of Delaware.

5.  Plaintiffs are related entities.

6.  Defendant, Sherwin-Williams Automotive Finishes Corp., ("SWAF"), is a Delaware corporation located in Cleveland, Ohio with a principal place of business at 817 Lincoln Avenue, Prospect Park, Pennsylvania 19076.

7.  Defendant, SWAF, is a manufacturer of high performance interior and exterior coatings for the automotive, fleet and heavy truck markets as well as associated products.  It serves automotive jobbers, wholesale distributors, collision repair facilities, dealerships, fleet owners and refinishers, production shops, body builders and original equipment manufacturers by its sale through one hundred seventy four company owned branches in the United States, Canada, Jamaica and Chile, as well as other operations in the United States, Canada, Mexico, Brazil, Jamaica, Chile and Italy.

8.  In addition to SWAF, DuPont, and PPG are significant manufacturers in the industry, and compete with SWAF.

9.  At all times relevant, Defendant, SWAF, sold and distributed automotive finishes and related products throughout the United States including the Commonwealth of Pennsylvania and the State of Delaware.  The automotive finish products were transported across state lines and were sold in Pennsylvania and Delaware by SWAF, various distributors and jobbers, including Plaintiffs who purchased SWAF's products and resold them to the end users.

**Statement of the Facts**

10.  In the Spring of 2000, SWAF approached JCD and Terrel, seeking their efforts as Jobbers on SWAF's behalf in Southeastern Pennsylvania and Delaware.  At that time, plaintiffs sold competing products; JCD sold DuPont automotive finish products in Pennsylvania and Terrel sold Valspar and Spies Hecker automotive finish products in Delaware.

11. During June and July of 2000, J.C.D. and Terrel negotiated and entered into a Direct Jobber Agreement with SWAF, in West Chester, Pennsylvania (hereinafter, the "Jobber Agreement"). A true and correct copy of the signed Jobber Agreement and a legible unsigned copy, are attached hereto as Exhibit "A".

12. Pursuant to the Jobber Agreement, J.C.D. maintains its office at the 111 S. Bolmar St., West Chester, PA location for itself and for Terrel.

13. Since July of 2000, J.C.D. and Terrel have used their best efforts and increased sales of Sherwin-Williams automotive finishes throughout their geographical territory.

14. In the Automotive Finish Industry, many finish manufacturers utilize specialized equipment to mix and apply the finishes. This proprietary equipment is expensive, often costing in the tens of thousands of dollars. Many finish manufacturers, including SWAF, assist the end user of the finishes by providing rebates and discounts on the finishes to finance the purchase of the proprietary equipment, in return for long term purchase agreements. These purchase agreements frequently extend for five (5) or more years.

15. The type of mix and application equipment a particular end user has installed, the commencement, renewal dates and buyout prices of the agreements, the specific products purchased, the price paid for such products, the usage rates of the products and the actual individual at the end user who has the authority to make the decisions, is economically valuable to Jobbers, distributors and manufacturers of automotive finishes, is information that is closely guarded by sellers of automotive finishes, such as plaintiffs, and is not readily ascertainable by competitors. Such information is herein referred to as "Trade Secrets."

16. Plaintiffs accumulated the Trade Secrets through their own efforts and at substantial cost. Plaintiffs have actively protected and guarded the Trade Secrets by refusing to share the Trade Secrets with other manufacturers, competitors and limiting the distribution of the information within their entities.

17. Defendant SWAF sought out plaintiffs because plaintiffs possessed substantial knowledge of the customers for automotive finishes in Southeastern Pennsylvania and Delaware.

18. During August of 2001, Troy Friesland, Mark Serniac, Bill Radolec and Jeff Warren of SWAF and the principals of the Plaintiffs met to discuss the policies and programs of SWAF. At

this meeting, Serniac explained that he was hired from PPG to increase sales for SWAF by developing an appropriate relationship between the jobbers, such as Plaintiffs, and the company stores.

19. At that August meeting, Serniac explained that because Plaintiffs maintained the DuPont distribution rights in Southeastern Pennsylvania, and were jobbers for SWAF in both Southeastern Pennsylvania and in the State of Delaware, that if Plaintiffs would provide a certain Trade Secrets, such as the list of their customers of both SWAF and DuPont products, including the manufacturer of mix machines used by the DuPont customers, what products they purchased, the volume of purchases, the amount of anticipated purchases and whether any agreements, contracts, deals or relationships were in force and about how long those agreements would remain in place, SWAF would not compete with Plaintiffs in Pennsylvania for those present DuPont customers. Serniac also stated that SWAF would later purchase the business from Plaintiffs and Plaintiffs could then work for SWAF and convert the DuPont accounts to SWAF.

20. The sales representative assigned by SWAF to J.C.D. and Terrel was Troy Friesland. Friesland was responsible to disseminate the policies and programs of SWAF to J.C.D. and Terrel under the Jobber Agreement.

21. Friesland, as part of the programs of SWAF, had plaintiffs entered into certain Agreements with SWAF and new customers brought to SWAF by J.C.D. and Terrel, including Delaware Cadillac, MasterTech and Kirkwood Dodge where both SWAF and plaintiffs would share expenses of sales discounts extending over a period of years.

22. Dave Winfree of Delaware Cadillac agreed to utilize SWAF automotive finishes based upon the sales efforts of Plaintiffs and the sharing of costs for the proprietary equipment among Delaware Cadillac, SWAF and Terrel. Since the commencement of the sales to Delaware Cadillac under this arrangement, SWAF has refused or failed to provide its portion of the rebate to Terrel. Terrel, as a result of SWAF's failure to make its portion of the payments, has been unable to pay SWAF for all of the finishing materials that it has sold to Delaware Cadillac.

23. Enoch Anderson and Jim Hill of MasterTech agreed to utilize SWAF automotive finishes based upon the sales efforts of Plaintiffs and the sharing of costs for the proprietary equipment among MasterTech, SWAF and Terrel. Since the commencement of the sales to MasterTech under this arrangement, SWAF has refused or failed to provide its portion of the rebate

to Terrel.  Terrel, as a result of SWAF's failure to make its portion of the payments, has been unable to pay SWAF for all of the finishing materials that it has sold to MasterTech.

24.     Arthur Benson of Kirkwood Dodge agreed to utilize SWAF automotive finishes based upon the sales efforts of Plaintiffs and the sharing of costs for the proprietary equipment among Kirkwood Dodge, SWAF and Terrel.  Since the commencement of the sales to Kirkwood Dodge under this arrangement, SWAF has refused or failed to provide all of its portion of the rebate to Terrel.  During 2001, SWAF paid $450 of the $600, but failed to pay any of the amounts due in 2002.

25.     Terrel, as a result of SWAF's failure to make its portion of the payments, was unable to pay SWAF for all of the finishing materials that it has sold to Kirkwood Dodge.

26.     This extension of payment time resulted in SWAF refusing to ship product to Plaintiffs except on a cash on delivery ("COD") basis.  Without the credits owed to it by SWAF, Plaintiffs was unable to purchase product on a COD basis.  Plaintiffs then acquired finishing products through a local SWAF distributor, authorized to sell SWAF finishing products.  Upon SWAF's discovery of these purchases, Bill Radolec, the Northeastern Regional Distribution Sales Manager, wrote to plaintiffs to remind plaintiffs that they was required to purchase finishing products through a particular branch distribution warehouse.  Additionally, the Huntington Valley branch did not stock the Dimension finishing products manufactured by SWAF that Plaintiffs was required to provide to its customers.

27.     On March 6, 2002, Jim Muse, the new Mid-Atlantic Regional Sales Manager, wrote to Plaintiffs and informed them that it would no longer be an authorized distributor of SWAF Automotive Finishes.  That notice was to be effective upon execution of the letter by an officer of Plaintiffs Pro Finishes.  Plaintiffs refused to sign that letter as it is not an accurate characterization of the conversation of March 6, 2002.

28.     On April 3, 2002, Jim Muse, sent a subsequent notice that terminates the Jobber Agreement on thirty days notice.  Such notice was effective on May 3, 2002.

29.     Plaintiffs invested significant funds and time in obtaining new customers for itself and SWAF since the beginning of the Jobber Agreement.

## Claims for Relief

### Breach of Contract
### Count I

30. Plaintiffs incorporate the averments of paragraphs 1 to 29 as if set forth herein at length.

31. SWAF has breached the Agreement and has caused harm.

32. SWAF has breached its Agreement by failing to meet its obligation under paragraph 3 of the Agreement by selling product to jobber in accordance with the policies and programs of SWAF which were in effect at the time of the purchase.

33. SWAF has failed to meet those provisions in that it has failed to honor the agreements made by Troy Friesland, including the reimbursements of Plaintiffs for shared expenses of SWAF and Plaintiffs in the changeover of certain customers from different finishing suppliers to SWAF. Such action constitutes a violation of §3.3 of the Agreement.

34. SWAF further failed to meet is obligations to Plaintiffs in §3.1 and §3.2 of the Agreement in that SWAF failed to assist Plaintiffs and to maintain a sufficient stock of Products.

35. Plaintiffs are presently entitled to credits and payments from SWAF in an amount in excess of $50,000, and such amount increases by $6,000 each month.

**WHEREFORE**, Plaintiffs respectfully requests the Court to grant judgment in their favor and against Defendant in an amount equal to their damages, presently believed by Plaintiffs to be in excess of $150,000, and granting such other relief as is necessary and appropriate, including costs, interest on funds due, legal fees and punitive damages.

### Fraud
### Count II

36. Plaintiffs incorporate the averments of paragraphs 1 to 35 as if set forth herein at length.

37. SWAF entered into the Jobber Agreement with plaintiffs representing to plaintiffs that they were commencing a long term relationship.

38. SWAF discussed exit strategies with plaintiffs for plaintiffs' owners to consider to plan the eventual sale of the business to SWAF or its designee when plaintiffs' owners no longer wanted to pursue the business.

39. SWAF, by entering into long-term agreements with customers and plaintiffs, represented that the relationship between plaintiffs and SWAF would continue during the terms of the agreements with customers.

40. SWAF, at the August 2001 meeting, represented that plaintiffs would be compensated for the Trade Secrets.

41. Plaintiffs, in reliance upon these representations, provided SWAF with trade secrets in the form of customer lists, expected customer purchases, and current finish usage in the region.

42. Plaintiffs, in reliance upon these representations, expended significant sums in sales efforts, training and materials.

43. Plaintiffs, in reliance upon these representations, entered into long-term agreements obligating it to future payments to its customers for the purchase of SWAF products.

44. Upon information and belief, SWAF entered into the Jobber Agreement to induce plaintiffs to disclose trade secrets to SWAF, to establish its own contacts with plaintiffs customers and then to terminate plaintiffs agreements for the purpose of avoiding the significant sales efforts and expenses in growing its sales in the plaintiffs geographic area.

45. Plaintiffs have been damaged by SWAF's actions.

46. SWAF's actions are outrageous.

**WHEREFORE**, Plaintiffs respectfully requests the Court to grant judgment in their favor and against Defendant in an amount equal to their damages, presently believed by Plaintiffs to be in excess of $150,000, and granting such other relief as is necessary and appropriate, including costs, interest on funds due, legal fees and punitive damages.

### Intentional Interference with Contractual Relations
### Count III

47. Plaintiffs incorporate the averments of paragraphs 1 to 46 as if set forth herein at length.

48.     SWAF has contacted customers of J.C.D. and Terrel in an attempt to directly sell automotive finishes to them. A true and correct copy of SWAF's letter to a current customer of J.C.D. and Terrel is attached hereto as Exhibit "B."

49.     SWAF has done so to convince such customers to obtain the automotive finishes directly from SWAF rather than through plaintiffs, despite agreements to the contrary.

50.     SWAF, without justification, has intentionally interfered with the existing contracts between Terrel Pro Finishes and J.C.D., Inc. and their clients.

51.     SWAF has contacted clients of J.C.D. and Terrel and induced them to not purchase SWAF automotive finishes from them that they would have otherwise ordered.

52.     On information and belief, SWAF has contacted clients of J.C.D. and Terrel with the intent to harm plaintiffs.

53.     J.C.D. and Terrel have been damaged by such interference in the loss of sales and profits justly earned by their sales efforts.

**WHEREFORE**, Plaintiffs respectfully requests the Court to grant judgment in their favor and against Defendant in an amount equal to their damages, presently believed by Plaintiffs to be in excess of $150,000, and granting such other relief as is necessary and appropriate, including costs, interest on funds due, legal fees and punitive damages.

**Misappropriation of Trade Secrets**

**Count IV**

54.     Plaintiffs incorporate the averments of paragraphs 1 to 53 as if set forth herein at length.

55.     SWAF by false promises of payment and long term relationship, induced plaintiffs to disclose Trade Secrets to SWAF.

56.     This information included detailed information about plaintiffs' customers including, *inter alia*, contacts, purchasing history, purchasing plans, pricing expectations, current usage, installed proprietary equipment and other information protected as trade secrets.

57.     SWAF's use of such information is prohibited in that such information constitutes a trade secret and was generated through significant effort and expense by plaintiffs.

58. SWAF's knowledge of plaintiffs protected Trade Secrets will permit it to unfairly compete directly with plaintiffs without the sales development time, expense and effort.

59. SWAF's use of the protected trade secrets will destroy J.C.D. and Terrel Pro Finishes, business and impose substantial damages.

60. SWAF's termination of the Jobber Agreement was motivated, in part, by SWAF's intention to use the trade secrets to the exclusion and damage of plaintiffs, without repayment therefore.

**WHEREFORE**, Plaintiffs respectfully requests the Court to grant judgment in their favor and against Defendant in an amount equal to their damages, presently believed by Plaintiffs to be in excess of $150,000, and granting such other relief as is necessary and appropriate, including costs, interest on funds due, legal fees and punitive damages.

## Unjust Enrichment
## Count V

61. Plaintiffs incorporate the averments of paragraphs 1 to 60 as if set forth herein at length.

62. SWAF induced plaintiffs to enter into agreements with customers by its promises, *inter alia*, to share the expenses of the change of proprietary equipment from another finishing materials manufacturer to SWAF.

63. Plaintiffs entered into the agreements for the benefit of SWAF and plaintiffs.

64. SWAF induced plaintiffs to disclose Trade Secrets to SWAF by its promises, *inter alia*, of payment and a long term relationship with SWAF.

65. The agreements with customers and the disclosure of Trade Secrets was a substantial benefit to SWAF, conferred by plaintiffs.

66. SWAF knew of the substantial benefit conferred upon it by plaintiffs.

67. It would be unjust to permit SWAF to benefit from its deceptive actions.

**WHEREFORE**, Plaintiffs respectfully requests the Court to grant judgment in their favor and against Defendant in an amount equal to their damages, presently believed by Plaintiffs to

be in excess of $150,000, and granting such other relief as is necessary and appropriate, including costs, interest on funds due, legal fees and punitive damages.

### Antitrust Violations – Sherman Act §§1 & 2; Clayton Act §3
### Count VI

68. Plaintiffs incorporate the averments of paragraphs 1 to 67 as if set forth herein at length.

69. SWAF attempted to monopolize through conspiracy the market for automotive finishes in Southeastern Pennsylvania and the State of Delaware.

70. Beginning at the meeting of August, 2001 and continuing until March of 2002, Defendant, SWAF, engaged in unlawful activities in restraint of trade and commerce in violation of §1 and §2 of the Sherman Antitrust Act.

71. The agreement that SWAF attempted to enforce with Plaintiffs is a violation of §1 of the Sherman Act in that it is an unlawful restraint of trade.

72. The restraints are unreasonable.

73. The relevant product market is the automotive finishes market.

74. The relevant geographic market is Southeastern Pennsylvania and the State of Delaware.

75. SWAF efforts at allocating customers had the effect of raising prices and restraining trade in the commodity.

76. Plaintiffs were injured when they had the competitive information which they provided pursuant to their reasonable expectation of acquisition being utilized against them without compensation and the refusal by SWAF to sell any further products to Plaintiffs.

**WHEREFORE**, Plaintiffs respectfully requests the Court to enter an Order granting judgment to plaintiffs in an amount equal to three times its damages, presently believed by Plaintiffs to be in excess of $150,000; and granting such other relief as is necessary and appropriate, including costs, interest on funds due, legal fees and punitive damages.

**JURY TRIAL DEMAND**

Plaintiffs demand a trial by jury pursuant to FRCP 38, of all issues triable by jury.

**PALMA & SBARBARO, LLC**

By: _____
John G. Bravacos, Esquire
Id. No. 53055
107 South Church Street
West Chester, PA 19382-3252
January 27, 2003    (610) 431-7300
Counsel for Plaintiffs
J.C.D., Inc., *t/a* J.L. Terrel's and
Terrel's Pro Finishes, Inc.

*r:\mraimato\bravacos\clients\litigate\terrels\pleadings\amfedcomplainrev.doc*